OPINION
{¶ 1} Defendant-Appellant, Anthony Garman, appeals a judgment of the Union County Court of Common Pleas, granting judgment in favor of Plaintiff-Appellee, S.H.Y., Inc. ("S.H.Y."), for breach of contract and fraud. On appeal, Garman contends that the trial court erred in ruling that evidence of Garman's prior criminal record could be introduced, that the trial court erred in not allowing the admission of certain photographs offered by Garman, that the trial court erred in awarding punitive damages, that the trial court's jury instruction on fraud failed to include an instruction on actual malice, that the trial court's damage award was improper and that the jury's verdict was against the manifest weight of the evidence. Finding that the trial court instructed the jury on an incorrect proposition of law as to the issue of punitive damages and that there is insufficient evidence to support a finding of actual malice as a matter of law, we reverse the judgment as to punitive damages. However, the judgment is affirmed in all other respects.
 {¶ 2} S.H.Y. is an Ohio corporation that was formed for the purpose of purchasing and operating the Marysville Golf Course located in Marysville, Ohio. The Marysville Golf Course is a semi-private course, which has members but is also open to the general public. In early 2001, S.H.Y., as a new owner of the golf course, took steps to make improvements to the course to attract new golfers. In late 2001, S.H.Y. solicited bids from several contractors to re-pave all of the existing asphalt parking lots and to pave the gravel cart path with asphalt. Garman placed a bid with S.H.Y. for one hundred twenty-nine thousand dollars. Garman's bid was one of the lower bids received by S.H.Y. at that time. Deciding that the bids were too high and that the project was not within its financial means, S.H.Y. put the project on hold.
 {¶ 3} In November of 2002, Garman approached S.H.Y. and spoke to newly hired golf-club manager, Paul Slaughter, to inquire if S.H.Y still sought to pave its driveways and cart path. Slaughter indicated that S.H.Y. was still not in a position to complete the project, but went on to inquire as to what Garman would charge. When Garman indicated a much lower price for the work, a meeting was set up between Garman, Slaughter, golf-course grounds man, Jeff Crotty and S.H.Y. stockholder, Sang Min Oh.
 {¶ 4} On November 8, 2002, a meeting was held. At that meeting, a written quote was presented to S.H.Y by Garman. In the quote, under the heading of materials, the writing stated that 5.3 miles of cart driveway would cost thirtyeight thousand dollars. Additionally, Garman quoted S.H.Y. a price of eight thousand dollars and two thousand dollars to repave a driveway and a garage area, respectively. Finally, the quote stated that there would be a ten year warranty on all asphalt stripping; a five year warranty on sealant; and, that payment would be received in halves, with the first payment of nineteen thousand dollars being distributed on November 11, 2002, and the second payment to be dispersed upon completion.
 {¶ 5} Deciding to accept Garman's quote of thirty-eight thousand dollars to complete the cart paths, S.H.Y. accepted that portion of the bid. However, S.H.Y. decided it could not afford to pave the driveway and the garage area, and, as a result, both quotes were lined out in the writing. Following the November 8, 2003 meeting, Garman and Oh both signed the writing.
 {¶ 6} On Monday November 18, 2002, Garman received the first installment payment of nineteen thousand dollars. After receiving the check, Garman himself left the golf course premises and never returned. Some of his employees did come to the golf course to work; however, there was a discrepancy as to how many days they worked. According to S.H.Y., after only two to three days of work, Garman's employees stopped working and left the job unfinished. When S.H.Y was unable to locate or contact Garman and his employees did not return to pave the cart path, S.H.Y contacted the Union County Sheriff's Office and reported the incident as a theft.
 {¶ 7} On December 2, 2002, S.H.Y. initiated this action against Garman and his wife Sandra Garman. In its complaint, S.H.Y. alleged fraud, breach of contract and racketeering. S.H.Y. voluntarily dismissed the racketeering claim prior to trial.
 {¶ 8} In July of 2003, a jury trial was held on the fraud and breach of contract claims. At trial, both S.H.Y. and Garman agreed that the November 8, 2002 bid did constitute a contract. While both agreed that pursuant to the contract Garman had agreed to pave the cart path for thirty-eight thousand dollars, there was a discrepancy over what was included within that contract price. According to S.H.Y., Garman's bid included everything — all labor and materials. Garman, on the other hand, argued that his bid only included labor.
 {¶ 9} To support its interpretation of the contract, S.H.Y. presented the testimony of Oh, Slaughter and Crotty. During Oh's testimony, he stated that Garman's thirty-eight thousand dollar bid was for everything and that Garman requested the initial nineteen thousand dollar payment for materials, including asphalt. He stated that Garman specifically agreed to have the entire job done within three days. He also stated that after Garman picked up the first nineteen thousand dollar check he never saw Garman again. However, Oh did state that Garman did send some of his employees to the golf course and that they did do some work. He stated that he tried to contact Garman and that he reported Garman to the authorities after he was unable to make contact with him and the work was no longer being done.
 {¶ 10} On cross examination, Oh acknowledged that Garman's original bid was one hundred twenty-nine thousand dollars, but stated that he believed the extreme price difference was the result of the end of the season asphalt prices. Oh also acknowledged that Garman's men had worked on the entire 5.3 miles of cart path. However, he stated that his own employees spent two weeks fixing the areas that Garman's men worked on. Finally, Oh stated that Garman had cut new paths, which he stated was agreed to orally and was not included in the written contract.
 {¶ 11} Both Slaughter and Crotty also testified to the terms of the contract and the work performed by Garman's employees. According to Slaughter, Garman approached him about doing the job. Additionally, both he and Crotty, testified that following the November 8 meeting, they believed that Garman was going to pave the entire 5.3 miles of cart path for thirty-eight thousand dollars, which included both labor and materials. Additionally, they stated that Garman never told anyone else at S.H.Y. that S.H.Y. was responsible for buying any materials, including asphalt.
 {¶ 12} Slaughter went on to state that Garman told him that he could finish the job in three to four days, but guaranteed it would be done in five days. According to Slaughter, Garman stated he could finish the job quickly, because he had a large crew of employees. He also stated that only two of Garman's employees worked on the cart path and that the men only worked for two and one half days. He went on to state that when he inquired with Garman's men as to where Garman's other employees were, why more progress was not being made and when the asphalt would arrive, Garman's men were very evasive with him. Slaughter also testified that he was unable to contact Garman at that point.
 {¶ 13} Finally, Slaughter testified about the work that Garman's employees did at the golf course. According to Slaughter, Garman's employees did dig out the cart paths to widen them and did remove sod from the area where S.H.Y. wanted the cart path to be extended for a turn around. However, he stated that S.H.Y. had to go back and fix everything that Garman's men had done, in order to put the cart paths back the way that they were prior to Garman's men working on them. According to Slaughter, this cost S.H.Y. approximately four thousand five hundred to five thousand dollars.
 {¶ 14} Additionally, Crotty testified about the specific work done by Garman's employees. According to Crotty, only two of Garman's employees worked on the golf course. He stated that the men worked approximately two and one half days. During that time, one of Garman's employees operated a bobcat front-end loader, using it to widen all the existing cart paths. According to Crotty, Garman's employee was widening the cart path beyond the necessary paving width, which Crotty stated that he did not understand. Additionally, he stated Garman's men did dig out the new path that S.H.Y. had orally requested. However, he stated that he ended up helping them, because he was concerned that Garman's men were not making enough progress. Finally, he testified that it took him and another S.H.Y. employee approximately fifteen days to fix the cart paths after Garman's men left.
 {¶ 15} Finally, S.H.Y. presented the testimony of Jim James and Keith Mathias. James was an employee of the local asphalt quarry. According to James, the quarry was open during the time that Garman's men were working on the golf course. Additionally, he stated that Garman never ordered any asphalt from the quarry during that period of time. Mathias, a construction project manager and estimator, testified that generally a bid such as Garman's would include both labor and materials. He went on to state that the asphalt price for paving 5.3 miles of cart path would be approximately fifty-three thousand dollars and that the total cost to complete that job would be approximately ninety-nine thousand dollars.
 {¶ 16} Both Garman and his wife, Sandra, testified, as well. According to Garman, the thirty-eight thousand dollar bid was only for labor. However, he also testified that the other two bids, which had been lined out on the written contract, included the price for both materials and labor. He acknowledged that he was not at the job personally supervising, but stated that he knew the work was getting done because his employees told him that the work was done. He went on to state that his employees worked approximately eight to ten days. However, he did not know of or have any records of the days or hours worked by any of his employees on the S.H.Y job.
 {¶ 17} Garman also presented the testimony of Charles Andrews, one of Garman's general supervisors. According to Andrews, Garman's men worked at the golf course for approximately eight days. However, he too had no records of the days and hours worked by the other employees. He testified that while he was not on the job the entire time, Garman's men were working and that he did come by the golf course every day to check on the job. He stated that Garman's employees worked on a drainage area, dug turn-a-rounds, hauled away dirt, widened the cart paths and spread gravel to prepare the cart paths for paving. He stated that he and Garman's other employees left because they were unable to get asphalt and that, at that time, the only thing left to do was to lay the asphalt. He stated that no golf course employees did any work to help them, that no gravel was spread outside the cart paths and that no mess was left. He also stated that he believed the golf course was going to buy the asphalt.
 {¶ 18} On rebuttal, both Slaughter and Crotty testified that they did not know who Andrews was and that they never saw him working at the golf course.
 {¶ 19} Upon the presentation of all evidence, S.H.Y. argued that it was entitled to damages under both its claims of breach of contract and fraud. First, under the claim of breach of contract, S.H.Y. argued that it was entitled to eighty thousand dollars in expectancy damages. According to S.H.Y, it was entitled to the damages that would put it in the same position it would have been in but for the breach of the written contract. In other words, it was entitled to compensation for the full price of having 5.3 miles of cart path paved, which S.H.Y. argued was a total of ninety-nine thousand dollars. S.H.Y. then went on to argue that that sum, ninety-nine thousand dollars, less the nineteen thousand dollars paid out to Garman, was the total expectancy damages requested under the breach of contract claim.
 {¶ 20} As for the fraud claim, S.H.Y. argued it was entitled to the nineteen thousand dollars, which was the amount of the first installment payment under the contract. According to S.H.Y. Garman defrauded it of this money by claiming that he needed the money to buy materials, which he never actually bought or had any intentions of buying. Additionally, S.H.Y. asked the jury to award punitive damages and attorney's fees if it found Garman had committed fraud.
 {¶ 21} Upon review of all the evidence, the jury found in S.H.Y.'s favor on both the breach of contract and fraud claims against Garman.[1] Additionally, the jury assessed forty-three thousand dollars in compensatory damages under the breach of contract claim. On S.H.Y.'s claim of fraud, the jury awarded S.H.Y. ten thousand dollars in compensatory damages and thirty-five thousand dollars in punitive damages. Finally, the jury awarded S.H.Y. attorney's fees.
 {¶ 22} It is from this judgment that Garman appeals, presenting the following assignments of error for our review.
 Assignment of Error No. I The trial court erred in ruling that evidence could beintroduced about prior criminal convictions of defendant, anthonygarman.
 Assignment of Error No. II The trial court erred in determining that photographsproffered by anthony could not be introduced into evidence.
 Assignment of Error No. III The trial court erred in awarding punitive damages.
 Assignment of Error No. IV The trial court's jury instruction failed to include arequirement of actual malice as a prerequisite of a finding offraud.
 Assignment of Error No. V The jury's award of actual damages in an amount greater thanthe contract was inappropriate.
 Assignment of Error No. VI The jury erred in determining that the parties contract calledfor anthony to provide materials.
 {¶ 23} Due to the nature of appellant's claims, we will be addressing the assignments of error out of order.
 Assignment of Error No. I {¶ 24} In the first assignment of error, Garman contends that the trial court erred in ruling that evidence of his prior criminal convictions could be introduced. Garman's argument centers upon a pretrial ruling made by the trial court in response to S.H.Y.'s Notice of Intent to Use Prior Convictions and Motion in Limine.
 {¶ 25} A motion in limine "`may be used as a means of raising objection to an area of inquiry to prevent prejudicial questions and statements until the admissibility of the questionable evidence can be determined during the course of the trial. It is a precautionary request, directed to the inherent discretion of the trial judge, to limit the examination of witnesses by opposing counsel in a specified area until its admissibility is determined by the court outside of the presence of the jury. The sustaining of a motion in limine does not determine the admissibility of the evidence to which it is directed. Rather it is only a preliminary interlocutory order precluding questions being asked in a certain area until the court can determine from the total circumstances of the case whether the evidence would be admissible. * * *.'" State v. Grubb (1986), 28 Ohio St.3d 199,201, quoting Palmer, Ohio Rules of Evidence Rules Manual (1984), at 446. Furthermore, as an appellate court, we need not review the propriety of a grant or denial of a motion in limine unless the claimed error is preserved by a timely objection when the issue is actually developed at trial. Id.; see, also, State v.Overmyer (Nov. 6, 2000), 3d Dist. No. 11-00-07.
 {¶ 26} Here, S.H.Y. filed a preliminary motion requesting clarification as to whether it could introduce evidence of specific prior convictions. That motion was granted. While S.H.Y. was given permission by the court to introduce evidence of Garman's prior criminal convictions, it never did so. Thus, as stated above, the trial court's ruling was merely a preliminary ruling and, as such, Garman was required to renew his objection to preserve the issue for appeal. Because the issue was never actually raised at trial, Garman did not renew his objection and, therefore, waived any appeal on this issue. See State v. Kerr,
9th Dist. No. 3205-M, 2002-Ohio-2095; State v. Schubert (Dec. 22, 1986), 3d Dist. No. 13-85-22. Consequently, Garman's first assignment of error is overruled.
 Assignment of Error No. II {¶ 27} In the second assignment of error, Garman argues that the trial court erred in refusing to admit certain photographs.
 {¶ 28} It is well settled that the admission of photographs is left to the discretion of the trial court. State v. Smith
(1997), 80 Ohio St.3d 89, 108. "The trial court has broad discretion in the admission * * * of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere." State v. Hymore (1967), 9 Ohio St.2d 122, 128. An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the trial court that is unreasonable, unconscionable, or arbitrary. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 29} A photograph is not objectionable if it is properly identified, if it is relevant and competent and if it is an accurate representation of the scene which it portrays. To introduce such a photograph, a proper foundation is required in which there must be testimony that the photograph is a fair and accurate representation of that which it is purported to be. SeeHeldman v. Uniroyal, Inc. (1977), 53 Ohio App.2d 21, 31, citingState v. Hill (1967), 12 Ohio St.2d 88, 90.
 {¶ 30} At trial, Garman attempted to introduce photographs. S.H.Y. objected for lack of foundation, because there was no evidence presented as to when the photographs were taken, who had taken them or whether they were a fair and accurate representation of that which they purported to be. At that time, the trial court sustained S.H.Y.'s objection. Garman offered no further testimony to lay a proper foundation. Thus, upon review of the record, we cannot say that the trial court abused its discretion in ruling that Garman failed to lay a proper foundation. Accordingly, the second assignment of error is overruled.
 Assignment of Error No. VI {¶ 31} In the sixth assignment of error, Garman contends that the jury's verdict was against the manifest weight of the evidence. Specifically, he argues that the evidence produced at trial supported a finding that the thirty-eight thousand dollar contract was only for labor and did not include materials or asphalt.
 {¶ 32} When a civil jury verdict is challenged as being against the manifest weight of the evidence, we review the record to determine whether it is "supported by some competent, credible evidence * * *." C.E. Morris v. Foley Constr. Co. (1978),54 Ohio St.2d 279, syllabus. Our review includes an analysis of the quality of evidence and witness credibility, but we undertake such review while giving deference to the fact finder's ability to observe witnesses and assess the proceedings personally.Schafer v. RMS Realty (2000), 138 Ohio App.3d 244, 278-279. Therefore, even though our review is broad, we will not reverse a civil judgment on manifest weight grounds unless the evidence cannot be interpreted in a way that supports the verdict.Central Motors Corp. v. Pepper Pike (1995), 73 Ohio St.3d 581,584.
 {¶ 33} In the case sub judice, S.H.Y. and Garman each presented different theories of the case. While both agreed that pursuant to the contract Garman had agreed to pave the cart path for thirty-eight thousand dollars, there was a discrepancy over what was included within that contract price. According to S.H.Y., Garman's bid included everything, labor and materials. Garman, on the other hand, argued that his bid only included labor. Each presented evidence on their theory of the case. Accordingly, because S.H.Y. presented some competent, credible evidence to support the jury's finding that the thirty-eight thousand dollar bid was to cover both materials and labor, we cannot say the jury's verdict is against the manifest weight of the evidence. Thus, the sixth assignment of error is overruled.
 Assignment of Error No. IV {¶ 34} In the fourth assignment of error, Garman argues that the jury's award of actual damages in an amount greater than the contract amount was inappropriate.
 {¶ 35} To recover for a breach of contract claim, a claimant must show injuries as a result of the breach in order to recover damages from the breaching party. Metro. Life Ins. Co. v.Triskett Illinois, Inc. (1994), 97 Ohio App.3d 228, 235. Damages are not awarded for a mere breach alone. "Generally, a party injured by a breach of contract is entitled to his expectation interest or `his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.'" Rasnick v. Tubbs (1998),126 Ohio App.3d 431, 437, citing Restatement of the Law 2d, Contracts (1981) 102-103, Section 344. Such compensatory damages, often termed "expectation damages," are limited to actual loss, which loss must be established with reasonable certainty. Doner v.Snapp (1994), 98 Ohio App.3d 597, 601.
 {¶ 36} Based upon our review of the record, we cannot say that the jury's damages award as to the breach of contract claim was inappropriate. While Garman argues that the damage award should have been capped at the contract price, which was thirty-eight thousand dollars, S.H.Y. was entitled to compensation for "the benefit of his bargain by being put in as good a position as [it] would have been in had the contract been performed." Accordingly, the jury's damage award was not limited by the written contract price.
 {¶ 37} Additionally, upon review of the record, we find that the jury's damage award, under the breach of contract claim, was supported by the record. At trial, S.H.Y. presented evidence to support its theory of the case that it was entitled to compensation for the full price of having 5.3 miles of cart path paved, including labor and materials. Based on the foregoing, we cannot find that jury award was against the manifest weight of the evidence. Furthermore, based on the evidence it presented at trial, S.H.Y. argued that it was entitled to a total of eighty thousand dollars — ninety-nine thousand dollars less the nineteen thousand dollars S.H.Y. prayed for under the fraud claim.
 {¶ 38} Because the jury's damage award was not limited to the written contract price of thirty-eight thousand dollars and because the jury's actual damage award was supported by the record, we find that Garman's fourth assignment of error is without merit. Accordingly, the fourth assignment of error is overruled.
 Assignment of Error Nos. III IV {¶ 39} In the third assignment of error, Garman asserts that the trial court erred in allowing punitive damages to be awarded in a contract case. In the fourth assignment of error, Garman contends that the trial court erred by failing to include in its instructions to the jury an instruction regarding a finding of actual malice prior to awarding punitive damages. Because these issues are interrelated, we will address them together.
 {¶ 40} Generally, the breach of a contractual duty does not give rise to punitive damages. Ketcham v. Miller (1922),104 Ohio St. 372, syllabus. However, punitive damages will be awarded in tort actions involving fraud, malice or insult. Roberts v.Mason (1859), 10 Ohio St. 277, 280.
 {¶ 41} While Garman is correct in stating that punitive damages are not an appropriate remedy in contract cases, he fails to acknowledge that fraud was at issue in his case. Here, S.H.Y. plead and tried claims of breach of contract and fraud. While S.H.Y. could not have prayed for punitive damages in a claim of breach of contract alone, its claim of fraud adequately allowed for it to pray for punitive damages on that claim. Accordingly, because S.H.Y. properly plead and tried Garman for fraud, the trial court did not err in allowing the issue of punitive damages to go to the jury. Thus, the third assignment of error is overruled.
 {¶ 42} While the issue of punitive damages was properly put before the jury, Garman goes on to attack the jury instructions on punitive damages given by the trial court. According to Garman, the trial court committed reversible error by failing to include in its instruction on punitive damages the required element of actual malice.
 {¶ 43} It is not every fraud claim that evokes the extraordinary remedy of punitive damages. In cases alleging fraud, in order to be awarded punitive damages, the plaintiff must establish not only the elements of the tort itself, but must also show that either the fraud is aggravated by the existence of malice or ill will or must demonstrate that the wrongdoing is particularly gross or egregious. Atram v. Star Tool Die Corp.
(1989), 64 Ohio App.3d 388, 391-392; Mid-America Acceptance Co.v. Lightle (1989), 63 Ohio App.3d 590, 602. There must be an element of malice, oppressive conduct or outrage to sustain such an award. Id.
 {¶ 44} Thus, based on the foregoing theory, Garman argues that the trial court erred in failing to instruct on the element of actual malice. We agree.
 {¶ 45} At trial, in its instructions on fraud, the trial court informed the jury that S.H.Y. was making a claim of fraud for nineteen thousand dollars against Garman. The court went on to define fraud, explain and define each of the necessary elements as well as give an instruction on S.H.Y's burden of proof. Next, the trial court instructed the jury on the following:
Now, if you find for the plaintiff on the fraud, just thefraud, not on the contract, but on the fraud, and you awardactual damage, you may also consider whether you will separatelyaward punitive damages. If you do not find actual damage, youcannot consider punitive damages.
 Punitive damages may be awarded against defendant as apunishment to discourage others from committing similar wrongfulacts. You're not required to award punitive damages to theplaintiff and you may not do so unless you find by the greaterweight of the evidence that the defendant acted with fraud.
 If you award punitive damages, the amount should be fair andreasonable under all the facts and circumstances. It should notbe excessive, or influenced by passion, sympathy, or prejudice.
 {¶ 46} Garman raised no objection nor offered an alternative instruction at trial to the jury instructions delivered by the trial court. The failure to object to or proffer a jury instruction generally results in the waiver of the issue on appeal. Goldfuss v. Davidson (1997), 79 Ohio St.3d 116, 121; Civ.R. 51(A). Nonetheless, an appellate court may recognize waived error if it rises to the level of plain error. Goldfuss,
79 Ohio St.3d at syllabus. However, in civil appeals, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where the otherwise waived error "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Id. According to the Ohio Supreme Court, "a `plain error' is obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse affect on the character and public confidence in judicial proceedings." Schade v. Carnegie Body Co. (1982),70 Ohio St.2d 207, 209.
 {¶ 47} Here, the trial court did not include within its instruction on punitive damages any instruction on actual malice, ill will, or a wrongdoing that is particularly gross or egregious. We conclude that the trial court's failure to include such an instruction does rise to the level of plain error.
 {¶ 48} Again, as a general rule punitive damages are only allowed in extraordinary cases, where a party is able to prove the existence of malice, ill will or a wrongdoing that is particularly gross or egregious. See Ketcham, 104 Ohio St. at syllabus; Roberts, 10 Ohio St. at 280. Here, the jury was never instructed of that fact. Instead, the jury was instructed that if it merely found fraud and believed that Garman should be punished then it could award punitive damages. Simply put, the trial court's jury instruction was a wrong proposition of law. Furthermore, we must presume that a jury follows the instruction given to it by the trial court. Pang v. Minch (1990),53 Ohio St.3d 186, 195. Therefore, we must presume that the jury in this case followed the improper proposition of law on punitive damages as given to it by the trial court. Because the trial court in this case failed to instruct the jury on the actual malice requirement, we will not read that requirement into its verdict.
 {¶ 49} In Brazen v. Brazzon (Mar. 13, 1986), 8th Dist. No. 50293, the Eight District Court of Appeals addressed a similar issue involving a jury instruction. While the Brazen Court was able to find that a jury had properly applied the law even where the trial court had given an incorrect instruction, that is not the case here. In Brazen, the court was able to infer that the jury had properly understood the law through its review of jury interrogatories and specific findings made by the jury. Here, however, we have no such interrogatories. Additionally, the jury's specific findings do not shed any additional light on the subject. Finally, S.H.Y. did not make any argument for actual malice in closing. Thus, upon review of the record, we cannot find that the jury was ever informed, nor did it inquire, as to the actual malice requirement of the punitive damages. Again, based upon our presumption that the jury has followed the trial court's instructions as given, we must assume that this jury followed the instructions given by this trial court. Those instructions were wrong. Without more, we will not assume the jury properly applied the law in absence of a proper instruction on malice.
 {¶ 50} Without a proper instruction or some other indicator that the jury understood and applied the law properly, the entire jury system, a staple of the judicial system, simply fails to function properly. We find this constitutes "plain error," as it is "obvious and prejudicial" and "if permitted, would have a material adverse affect on the character and public confidence in judicial proceedings." Schade, 70 Ohio St.2d at 209. Accordingly, a judgment based upon a wrong proposition of law goes to the very core of the underlying judicial process itself, constituting plain error.
 {¶ 51} Having found that the trial court instructed the jury on an incorrect proposition of law as to the issue of punitive damages, we find Garman's fourth assignment of error to be well taken. Furthermore, upon review of the entire record, there is insufficient evidence to support a finding of actual malice as a matter of law. As such, the judgment as to punitive damages is reversed. Finally, because the award of punitive damages must be reversed, attorney fees are also improper. Columbus Finance,Inc. v. Howard (1975), 42 Ohio St.2d 178, 183.
 {¶ 52} Having found error prejudicial to the Appellant herein, in the particulars assigned and argued, we reverse the judgment of the trial court as to award of punitive damages and attorney fees. Furthermore, the cause is remanded for further proceedings consistent with this opinion. The judgment is affirmed in all other respects.
Judgment Reversed in Part, Affirmed in Part and CauseRemanded.
 Shaw, P.J., concurs in judgment only.
 Bryant, J., concur.
[1] Additionally, the jury found in favor of Sandra Garman on all claims relevant to her. Because those issues are not relevant to this appeal, we will not address them.