**[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 581.]**

CENTRAL MOTORS CORPORATION, APPELLEE *v*. CITY OF PEPPER PIKE ET AL.,
APPELLANTS.

**[Cite as *Cent. Motors Corp. v. Pepper Pike*, 1995-Ohio-289.]**

*Zoning—Pepper Pike zoning ordinance No. 1981-21 permitting townhouse units at a maximum density of 2.5 units per acre constitutional.*

(No. 94-375—Submitted May 23, 1995—Decided September 6, 1995.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 64422.

————————————

{¶ 1} The twenty-one-year-old case before us concerns the constitutionality of a zoning ordinance as applied to appellee's property.

*The Property*

{¶ 2} Central Motors Corporation ("CMC"), appellee, is an Ohio corporation owned by members of the Porter family. CMC owns approximately one hundred fourteen undeveloped acres located in the southwest corner of the city of Pepper Pike ("Pepper Pike"), appellant.

{¶ 3} In 1959, CMC purchased approximately two hundred acres of land within the cities of Beachwood and Pepper Pike for approximately $2,500 per acre. In 1962, the state of Ohio acquired 33.68 acres of the parcel by eminent domain for the construction of I-271. Ohio paid CMC $212,987 for the acquisition. The six-lane highway bisected CMC's property leaving approximately one hundred seventeen acres in Pepper Pike. The Cleveland Electric Illuminating Company, in 1977, appropriated two and one half acres of the property's southwest corner to install an electrical substation. The remaining one hundred fourteen acres, however, have not undergone any development or improvement since 1959 and the property does not have on-site storm sewers or sanitary sewers.

{¶ 4} Rectangularly shaped, CMC's property is bordered on the east by Brainard Road, a two-lane residential street in Pepper Pike. Across from the property on the east side of Brainard Road are eighteen single family homes on one acre or greater lots. On the property's west border is I-271 and high voltage transmission lines and poles associated with the electrical substation. To the property's north is a narrow strip of undeveloped land abutting South Woodland Road. Across South Woodland Road to the north is a new subdivision developed for single-family residential homes on one-acre lots.

{¶ 5} On the south, the property abuts Woodmere Village and on that border starting from the west is the I-271/Chagrin Boulevard interchange, a bank office building, the Village Square Shopping Center and other commercial uses. The parcel has no frontage on Chagrin Boulevard.

*Zoning History*

{¶ 6} In 1959, when CMC purchased it, the property was zoned for single-family residential dwellings with a one-acre minimum lot requirement.

{¶ 7} In the early 1970's, CMC proposed a planned unit development which included high-rise office buildings, mid- and high-rise condominium/apartment buildings and clustered townhouses. Pepper Pike refused to rezone. CMC then amended its planned-unit-development proposal and requested that the property be zoned for three different uses. CMC wanted its property rezoned to allow a campus office park consisting of seven buildings on one third of the parcel at the southwestern edge of the property. On another third of the parcel, north of the proposed office park and abutting the interstate, CMC proposed zoning to allow thirteen five-story condominium buildings consisting of three hundred ninety condominium units total, or thirty units per building. The remaining area was to be restricted to development of one hundred twenty townhouse units, arranged in clusters.

2

{¶ 8} In 1981, several years after this case began, Pepper Pike's city council passed ordinance No. 1981-21, which rezoned the property from the detached single-family zoning to townhouse cluster zoning with a maximum density of 2.5 units per acre. The electorate ratified the new zoning ordinance. The new zoning ordinance restricted the use of the property to no more than four units per structure, with a maximum height of thirty-five feet or two and one-half stories and a minimum of thirty feet between each townhouse. That ordinance also mandated a set back of one-hundred-fifty feet from South Woodland Road, Brainard Road and I-271.

*Case History*

{¶ 9} In 1974, when Pepper Pike refused to rezone CMC's property, CMC sued for a declaration that Pepper Pike's single family residential zoning of CMC's property was unconstitutional. From 1974 to the present, the case has been back and forth between the trial court and the Cuyahoga County Court of Appeals on numerous occasions.

{¶ 10} The case was originally tried in 1976, prior to Pepper Pike's rezoning CMC's property to townhouse use. After CMC presented its evidence and rested, Pepper Pike moved for dismissal under Civ.R. 41(B)(2) which the trial court granted. The court of appeals reversed the dismissal, holding that the trial court erred because CMC demonstrated its right to relief by clearly removing the validity of the single-family zoning classification beyond fair debate. *Cent. Motors Corp. v. Pepper Pike* (1979), 63 Ohio App.2d 34, 13 O.O.3d 347, 409 N.E.2d 258.[1]

{¶ 11} The present appeal concerns the constitutionality of zoning ordinance No. 1981-21 which permitted townhouse units at a maximum density of

---

1. Pepper Pike rezoned CMC's property to townhouse use in 1981 and the trial court dismissed the case as moot. The court of appeals reversed the trial court, finding that in the circumstances of this case, the trial court abused its discretion by failing to allow CMC to amend its complaint. *Cent. Motors Corp. v. Pepper Pike* (1983), 9 Ohio App.3d 18, 9 OBR 19, 457 N.E.2d 1178.

2.5 units per acre. After a full trial concerning the 1981 zoning ordinance, the trial court held that the low-density townhouse zoning as applied to CMC's property was unconstitutional. Having determined that Pepper Pike had rezoned the property under the opportunity provided by *Union Oil Co. of California v. Worthington* (1980), 62 Ohio St.2d 263, 16 O.O.3d 315, 405 N.E.2d 277, the trial court found CMC's proposed use, with some exceptions, to be reasonable and ordered Pepper Pike to submit proposed zoning regulations permitting the court-approved uses.[2] After receiving the proposed zoning regulations, the trial court appointed its own expert and entered judgment based on the court-appointed expert's recommendations. The court of appeals affirmed the trial court's decision.

{¶ 12} The cause is before this court pursuant to the allowance of a discretionary appeal.

_____

*Thompson, Hine & Flory*, *David L. Parham* and *Karen E. Rubin*, for appellee.

*Walter & Haverfield*, *Christopher L. Gibbon* and *R. Todd Hunt*, for appellants.

*John E. Gotherman* and *Malcolm C. Douglas,* urging reversal for *amici curiae*, Ohio Municipal League and Ohio Municipal Attorneys Association.

*Clarence D. Rogers*; *Zashin, Rich & Sutula* and *Robert I. Zashin*, urging reversal for *amicus curiae*, residents of the city of Pepper Pike.

_____

**COOK, J.**

---

2. Pepper Pike appealed at this time and the court of appeals dismissed that appeal for lack of a final appealable order. *Cent. Motors Corp. v. Pepper Pike* (July 8, 1991), Cuyahoga App. No. 61398, unreported.

{¶ 13} In this case we are asked to determine whether Pepper Pike's zoning of CMC's property is unconstitutional and whether Pepper Pike had used its one opportunity to rezone to cure the constitutional defect, thereby allowing the judicial rezoning of the property. We hold that the zoning ordinance is constitutional and, thus, do not reach the issue of whether judicial rezoning was proper.

{¶ 14} Neither party contests the legal principles governing this case. Rather, the dispute concerns the application of those principles to the specific facts of this case. In analyzing the constitutionality of zoning ordinances, we necessarily begin with the strong presumption that the ordinance is valid. *Valley Auto Lease of Chagrin Falls, Inc. v. Auburn Twp. Bd. of Zoning Appeals* (1988), 38 Ohio St.3d 184, 185, 527 N.E.2d 825, 827; *Franchise Developers, Inc. v. Cincinnati* (1987), 30 Ohio St.3d 28, 32, 30 OBR 33, 36, 505 N.E.2d 966, 970; *Hudson v. Albrecht, Inc.* (1984), 9 Ohio St.3d 69, 71, 9 OBR 273, 275, 458 N.E.2d 852, 855; *Brown v. Cleveland* (1981), 66 Ohio St.2d 93, 95, 20 O.O.3d 88, 89, 420 N.E.2d 103, 105. We note that the party challenging the validity of a zoning classification bears, at all stages of the proceedings, the burden of demonstrating that the provision is unconstitutional. *Ketchel v. Bainbridge Twp.* (1990), 52 Ohio St.3d 239, 557 N.E.2d 779; *Valley Auto*, *supra*; *Mayfield-Dorsh, Inc. v. S. Euclid* (1981), 68 Ohio St.2d 156, 157, 22 O.O.3d 388, 429 N.E.2d 159, 160.

{¶ 15} In reviewing the trial court's decision to invalidate Pepper Pike's zoning ordinance, we are guided by the principle that judgments supported by competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. If the evidence is susceptible to more than one interpretation, we must give it the interpretation consistent with the trial court's judgment. See *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273.

{¶ 16} Recently, this court reaffirmed the well-established standard of review that in order to invalidate a zoning ordinance on constitutional grounds, the party attacking the regulation must establish, beyond fair debate, that the zoning classification denies the owner an economically viable use of the zoned property and that the zoning classification fails to advance a legitimate governmental interest. *Gerijo, Inc. v. Fairfield* (1994), 70 Ohio St.3d 223, 638 N.E.2d 533, syllabus. This court has stated that there is little difference between the "beyond fair debate" standard and the "beyond a reasonable doubt" standard. *Karches v. Cincinnati* (1988), 38 Ohio St.3d 12, 19, 526 N.E.2d 1350, 1357, fn. 7. "A court may substitute its judgment for that of the local governing body only when a municipality exercises its zoning power in an arbitrary, confiscatory or unreasonable manner which violates constitutional guaranties." *Gerijo* at 226, 638 N.E.2d at 536. "*** [T]he court can not usurp the legislative function by substituting its judgment for that of the council. Municipal governing bodies are better qualified, because of their knowledge of the situation, to act upon these matters than are the courts. *** The legislative, not the judicial, authority is charged with the duty of determining the wisdom of zoning regulations, and the judicial judgment is not to be substituted for the legislative judgment in any case in which the issue or matter is fairly debatable." *Willott v. Beachwood* (1964), 175 Ohio St. 557, 560, 26 O.O.2d 249, 251, 197 N.E.2d 201, 203-204.

{¶ 17} Applying the two-pronged test reannounced in *Gerijo* to this case, we begin with the issue of whether Pepper Pike's zoning ordinance failed to advance a legitimate government interest. Pepper Pike maintains that zoning ordinance No. 1981-21 advanced its interest of retaining the residential character of the property, the neighborhood and the community. CMC contends the zoning does not advance a legitimate government interest because Pepper Pike does not have a comprehensive master plan, CMC's property is unique and increased traffic alone cannot justify a governmental interest.

{¶ 18} This court has consistently recognized that a municipality may properly exercise its zoning authority to preserve the character of designated areas in order to promote the overall quality of life within the city's boundaries. Gerijo, at 228, 638 N.E.2d at 538; *Franchise Developers*, 30 Ohio St.3d at 33, 30 OBR at 37, 505 N.E.2d at 971; and *Hudson*, 9 Ohio St.3d at 73, 9 OBR at 276, 458 N.E.2d at 856. Further, while traffic considerations may not always be sufficient, in and of themselves, to justify a particular zoning ordinance, this court has held several times that a "city may lawfully regulate [safety hazards] pursuant to its police powers: protection of pedestrians and drivers, elimination of traffic congestion and reduction of air and noise pollution." *Brown*, 66 Ohio St.2d at 96, 20 O.O.3d at 90, 420 N.E.2d 106; *Leslie v. Toledo* (1981), 66 Ohio St.2d 488, 491, 20 O.O.3d 406, 408, 423 N.E.2d 123, 125.

{¶ 19} The evidence presented on behalf of Pepper Pike at trial indicates that after seven years of court involvement, the city rezoned CMC's property from single-family residential dwellings with a one-acre minimum lot requirement to townhouse cluster zoning with a maximum density of 2.5 units per acre. With this ordinance, Pepper Pike attempted to balance the competing interests of CMC and the other residents of Pepper Pike. One of Pepper Pike's objectives, as seen in its 1990 zoning map, was to restrict commercial development to the Chagrin Boulevard corridor and to keep Brainard Road a residential road. Zoning ordinance No. 1981-21 served to buffer the single-family homes from the intensive commercial and office development along Chagrin Boulevard.

{¶ 20} CMC's property was unique because it was one of the last undeveloped properties in Pepper Pike and abuts other political subdivisions and commercial uses. By zoning the property for a higher density of units and clustering of those units, Pepper Pike provided the necessary flexibility for development of the property, addressed the impact of the outside influences on the property, and maintained the residential character of the neighborhood and

community. According to one of Pepper Pike's experts, development of the property as zoned by Pepper Pike would maintain the residential character of Pepper Pike's neighborhoods on Brainard Road and be compatible with the other single-family homes adjoining the property while providing the flexibility of higher density, larger set backs, and wooded space, to buffer the adverse influences of the Village Square Shopping Center on the south and I-271 on the west.

{¶ 21} As to the adverse influences surrounding CMC's property, Pepper Pike's expert testified that the best way to separate incompatible uses such as retail or an interstate highway from residential development is to solve the problem at the site. "I find in my current experience that probably the best way when you have something that you are trying to separate from one use to the other, the best thing to do is to solve it right at the place, put in the necessary separations, screening and buffering and then go right into the development that you probably ought to have on that site in the first place." By combining mounding, fencing and natually wooded space, the adverse influences could be diminished. Other developments in Cuyahoga County where barriers had been erected along freeways and behind commercial areas have successful expensive single-family residential developments.

{¶ 22} While a townhouse development would add 1,716 cars per day to Brainard Road, a two-lane, residential road, Pepper Pike demonstrated that the proposed commercial development would add 17,295 cars per day. Eighteen single-family homes were located on Brainard Road across from the property at issue.

{¶ 23} In finding that zoning ordinance No. 1981-21 did not advance a legitimate government interest, the trial court focused on the unique character of the property and the lack of a comprehensive master plan or "serious planning considerations." In discussing the particular government interests advanced, the common pleas court only addressed the issue of traffic concerns and concluded that

those concerns, in this case, were insufficient to justify the zoning ordinance. On this issue, the court of appeals compared zoning ordinance No. 1981-21 with the CMC's proposed uses and concluded that CMC's proposed zoning "better promotes" Pepper Pike's desire to use CMC's property as a buffer between commercial and residential areas than does zoning ordinance No. 1981-21, and that the use of the property as a buffer was illusory because the townhouses would not have any buffer themselves. We disagree. Pepper Pike presented credible evidence to support the transitional use of zoning CMC's property for 2.5 units-per-acre density townhouse use.

{¶ 24} While both the trial court and the court of appeals correctly stated the law, both misapplied their pronouncement to the facts of the case. Whether CMC's proposed zoning might "better" advance the stated governmental interest does not address the issue of whether zoning ordinance No. 1981-21 advances a legitimate government interest. Likewise, whether the traffic concerns were substantially advanced by the zoning does not address whether any other legitimate government interest existed. "The judgment of the judiciary is not to be substituted for that of the legislature when an issue is fairly debatable so that reasonable minds may differ." Gerijo, at 229, 638 N.E.2d at 538.

{¶ 25} We will not substitute our opinion for that of the legislative entity when the evidence presented clearly contradicts a finding that zoning ordinance No. 1981-21 was arbitrary or that it failed to substantially advance a legitimate government interest. Pepper Pike demonstrated that its zoning ordinance implemented a coherent land-use policy derived from a rational consideration of the needs of the community as a whole. We, therefore, hold that CMC failed to demonstrate beyond fair debate that zoning ordinance No. 1981-21 did not substantially advance Pepper Pike's legitimate governmental interest in protecting and maintaining the residential character of the property, neighborhood and community.

{¶ 26} Continuing our analysis under the two-part test, we next consider whether zoning ordinance No. 1981-21 deprived CMC of an economically viable use. *Id.* at syllabus; *Columbia Oldsmobile, Inc. v. Montgomery* (1990), 56 Ohio St.3d 60, 564 N.E.2d 455. A zoning ordinance denies a property owner an economically viable use if it denies an owner all uses except those which are highly unlikely or practically impossible under the circumstances. *Gerijo*, at 228, 638 N.E.2d at 537-538.

{¶ 27} Both the trial and appellate courts focused on the most viable use of the property and not on whether the zoning ordinance allowed for a viable use. The court of appeals stated "that the most productive use of the land from an economic standpoint for both parties would be to allow the proposed use rather than the existing all-townhouse zoning." Whether this statement is correct or not, the judiciary is not to substitute its judgment for that of the legislative body. In this case, Pepper Pike had increased the density of the units allowed on CMC's property from the original one unit per acre to 2.5 units per acre.

{¶ 28} Preliminarily, we note that both courts, while acknowledging diminution in value alone is insufficient to invalidate an existing zoning ordinance, based their rulings, in part, upon the determination that under that zoning, CMC would suffer a ninety percent diminution in the value of the portion of the property proposed for office use. To arrive at this conclusion, the courts compared CMC's undeveloped property to developed commercial property located in Beachwood selling for $300,000 to $500,000 per acre.[3] The proper comparison for the diminution in value would have been the difference in the value of the property as zoned, $14,900 per acre or $1.7 million according to CMC's expert or $32,500 or $3.7 million according to Pepper Pike's expert, and the value of the property as

---

3. While the court of appeals noted that the lack of on-site development on the CMC property would affect the diminution in value, the court failed to reach any substantive conclusion about the actual diminution in value in this case.

proposed to be zoned, $34,210 per acre or $3.9 million according to CMC's expert. Thus, the disparity in value is not as significant as either court stated because of the failure to account for the difference between developed and undeveloped land.

{¶ 29} The trial court found that zoning ordinance No. 1981-21 deprived CMC of an economically feasible use of its land because the low density of 2.5 units per acre precluded the recovery of the up-front cost of bringing sanitary sewers to the site. Pepper Pike argues that the trial court erroneously included all the development costs when reviewing one of Pepper Pike's expert's figures. We agree.

{¶ 30} Pepper Pike's expert, a developer, testified that a successful townhouse development in accordance with zoning ordinance No. 1981-21 could be built with a fifteen percent profit on capital risked for townhouses in the range of $250,000 to $300,000. In order to provide that development, the developer testified that he could improve the land for a profit if he could purchase the property at $70,000 to $75,000 per acre. He assumed that the purchase price included the off-site improvements for sanitary treatment and a barrier for the attenuation of sound from I-271. The value of the land plus the costs of a sound barrier and off-site sewage treatment, according to the parties' other experts, ranged from $30,824 to $61,819 per acre. Thus, the costs were well below the price the developer would be willing to pay for the land.

{¶ 31} In comparing the developer's testimony with that of other experts, the trial court used all the development costs, which it found to be approximately $86,000 per acre. The court of appeals recognized this error in its recitation of the facts, but in its analysis erroneously used both the on-site and off-site improvement costs to determine that the property costs and the improvement costs precluded the development of this property. Without the trial court's and court of appeals' reliance on the erroneous statement of Pepper Pike's expert testimony, CMC did

not meet its burden of proving beyond fair debate the lack of an economically viable use of its property.

**{¶ 32}** The judgment of the court of appeals is reversed.

*Judgment reversed.*

MOYER, C.J., DOUGLAS, RESNICK AND F.E. SWEENEY, JJ., CONCUR.

WRIGHT, J., CONCURS IN JUDGMENT ONLY.

PFEIFER, J., DISSENTS.

_____

**WRIGHT, J., concurring in judgment only.**

**{¶ 33}** Although I agree with the reversal of the judgment of the court of appeals, I disagree with the majority's continued use of a conjunctive test, which this court expressly adopted in *Gerijo, Inc. v. Fairfield* (1994), 70 Ohio St.3d 223, 638 N.E.2d 533, syllabus. In adopting and following the conjunctive test, this court has drifted away from the specific constitutional provisions that govern zoning ordinances and has abandoned the proper constitutional principles, as announced by the United States Supreme Court. As discussed below, requiring any party who challenges the constitutionality of a zoning ordinance to prove, beyond fair debate, *both* that the ordinance deprives him of an economically viable use *and* that it fails to advance a legitimate governmental interest effectively strips individuals of rights guaranteed by the United States Constitution.

**{¶ 34}** A party who challenges the constitutionality of a municipal zoning ordinance normally asserts that the ordinance violates the Due Process Clause of the Fourteenth Amendment and/or the Takings Clause of the Fifth Amendment, applicable to states and their political subdivisions through the Fourteenth Amendment. However, today's opinion, like our other recent cases concerning the constitutionality of zoning laws, does not identify the specific constitutional provision(s) that it is interpreting. As such, I will articulate the proper constitutional analysis under both provisions.

{¶ 35} In applying the Takings Clause, the United States Supreme Court has adopted a disjunctive test, which provides individuals with greater protections from governmental interferences with their property than the majority's conjunctive test. A zoning ordinance effects a taking of property without just compensation in contravention of the Fifth and Fourteenth Amendments if it "'does not substantially advance legitimate state interests *or* denies an owner economically viable use of his land.'" (Emphasis omitted in part.) *Lucas v. S. Carolina Coastal Council* (1992), 505 U.S. ___, ___, 112 S.Ct. 2886, 2894, 120 L.Ed.2d 798, 813 (quoting *Agins v. Tiburon* [1980], 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112).

{¶ 36} With regard to the Due Process Clause of the Fourteenth Amendment, the United States Supreme Court has held that a zoning ordinance deprives an owner of his property without due process of law if it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Euclid v. Ambler Realty Co.* (1926), 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303, 314; see, also, *Nectow v. Cambridge* (1927), 277 U.S. 183, 187-188, 48 S.Ct. 447, 448, 72 L.Ed. 842, 844. As is readily apparent, an unreasonable ordinance that fails to advance a legitimate governmental interest violates the Due Process Clause, as interpreted in *Euclid*, but is deemed constitutional under the majority's conjunctive test, unless the ordinance also deprives the owner of all economically viable use of the property.

{¶ 37} Although states may afford individuals greater rights than those afforded under the federal Constitution, states cannot deprive individuals of rights that are guaranteed by the federal Constitution. Because the majority's conjunctive test does not provide individuals with the full protections afforded by the federal Constitution, it is, itself, unconstitutional. When reviewing the constitutionality of zoning ordinances, this court should abandon the conjunctive test and follow the

proper legal standards under the Takings Clause and/or the Due Process Clause, as articulated by the United States Supreme Court.

_____

**PFEIFER, J., dissenting.**

{¶ 38} While I agree with Justice Wright's conclusion that a disjunctive test should be applied when evaluating the constitutionality of zoning regulations, the findings of fact and conclusions of law of the trial court should remain undisturbed.

{¶ 39} The trial court found that the zoning scheme was unconstitutional because it was arbitrary, confiscatory, unreasonable and did not bear a substantial relationship to the public health, safety, morals and general welfare. As its rationale for its zoning plan, the city claims that there is a need for a transitional buffer between residential and commercial properties. Using the property for low-density townhouses does little to further the city's objectives. The city's proposed use of the property is purely residential. A scheme which gradually shifts the use of property from commercial to residential would acheive a result consistent with the city's rationale, and was precisely the remedy crafted by the trial court. I accordingly dissent.

_____