OPINION
{¶ 1} Plaintiffs-appellants, Andrew E. Starinchak and Elaine Starinchak, on behalf of herself and the estate of Andrew J. Starinchak, appeal from the judgment of the Franklin County Court of Common Pleas in favor of defendant-appellee, James O. Sapp. For the following reasons, we affirm.
 {¶ 2} Sometime in the evening of August 1, 1998, a motor vehicle struck and killed Andrew J. Starinchak, the Starinchaks' 31-year-old son, as he bicycled along Central College Road in Westerville, Ohio. Andrew's body was found the next morning lying in a ditch alongside the road. Near his mangled bicycle, police investigators found two white, molded fiberglass pieces that were broken off from a passenger-side ground effects piece that would have been attached to a Chevrolet Astro or a GMC Safari. Despite media coverage of the hit-and-run and the police investigation, no one was ever arrested or charged for Andrew's death. However, as a result of their own investigation, the Starinchaks believed Sapp was the driver of the vehicle and, on December 8, 2002, they filed an action against him for wrongful death.
 {¶ 3} At trial, Terry Wassmuth, a detective with the Franklin County Sheriff's Department, and David McMannis, a deputy sheriff with the Franklin County Sheriff's Department, testified that they responded to the scene of a hit-and-run on the morning of August 2, 1998. Detective Wassmuth testified that they found Andrew's body, his bicycle and the ground effects pieces in the ditch on the north side of Central College Road. On the edge of the road east of the bicycle, the police investigators found bicycle tire skid marks. Based on the damage to the bicycle and the skid marks, the police investigators determined that Andrew was hit from behind by a vehicle driving west; the same direction as he was bicycling.
 {¶ 4} Within days, the police investigators ascertained that the molded fiberglass pieces in their custody were from a ground effects piece manufactured by the Glavel Corporation ("Glavel"). Glavel designed, built and installed such pieces as part of the process of converting basic van models into more luxurious vans, i.e., conversion vans. A ground effects piece is a long, flat piece of fiberglass that runs from the back edge of the front wheel well, along the bottom of the rocker panel and to the front edge of the back wheel well. Ground effects pieces are installed by fitting the piece to the van, randomly drilling six to ten holes into the piece and through the sides of the wheel wells and the bottom of the rocker panel, and then attaching screws.
 {¶ 5} The ground effects pieces in police custody fit only 1985 — 1994 Chevrolet Astro and GMC Safari models. The police investigators requested and received from Glavel a list of 1990 — 1994 Chevrolet Astros and GMC Safaris that Glavel had sold to dealerships in Ohio. The police investigators then began visiting the owners of the vans to determine if each van was damaged or recently repaired.
 {¶ 6} Additionally, working from the Yellow Pages, the police investigators contacted body shops in northeastern Franklin County asking if anyone had recently sought to repair a white Chevrolet Astro or GMC Safari with damage to the hood, windshield, front bumper and/or passenger side. The police investigators also issued a notice to all local police agencies to contact the Franklin County Sheriff's Office with any information regarding a white Chevrolet Astro or GMC Safari with damage to its front and/or passenger side.
 {¶ 7} Deputy Sheriff McMannis testified that, on the evening of August 5, 1998, he spotted a conversion van with Glavel ground effects pieces while he was driving with his daughter. McMannis examined the van — a 1993 Chevrolet Astro — but he did not see fresh damage or evidence of recent repairs to the front and passenger side. To McMannis, the ground effects pieces on the van did not look new and appeared evenly worn.
 {¶ 8} McMannis further testified that he returned to take Polaroid photographs of the van on the morning of August 7, 1998. That morning, McMannis talked with Sapp, the owner of the van. Sapp told McMannis that he was welcome to take photographs of the van and use them in the investigation. McMannis memorialized taking the photographs in his log book, a calendar he used to record his daily activities.
 {¶ 9} Sometime in late August or early September, McMannis contacted Sapp again and asked Sapp if he would allow his van to be used as an exemplar in a Crime Stoppers segment. Sapp consented, and the segment was taped on September 2, 1998 and was aired on Channel 6 on September 6, 1998.
 {¶ 10} Three days later, on September 9, 1998, Sapp traded in his van for a truck. Sapp explained at trial that he traded in his van because he no longer needed a family vehicle as his fiancé owned an SUV. The van was resold, involved in an accident and then reported stolen.
 {¶ 11} Although the Crime Stoppers segment and the police investigation resulted in some tips, no one was arrested and charged for Andrew's death. The Starinchaks, however, were undeterred and pursued an investigation of Andrew's death themselves. Like the police investigators, the Starinchaks visited the owners of white Glavel vans looking for vans that were either damaged or showed signs of repair to the front and passenger side. For a long time, the focus of the Starinchaks' investigation was another man, who allegedly bragged of striking and killing a bicyclist and leaving the scene. In an attempt to connect this other man with a Glavel van, Elaine contacted Metro Chevrolet in July 2001. During that telephone call, Elaine discovered that Metro had in its possession a 1990 Chevrolet Astro with Glavel ground effects pieces. Elaine contacted the Franklin County Sheriff's Office, who made the decision to impound the van, in part, because the VIN was ground out. After Chevrolet provided the location of the hidden VIN, the police investigators determined that the van in their custody was actually the 1993 Chevrolet Astro that Sapp had once owned.
 {¶ 12} While the van was in the police impound lot, Deputy Steve Fickenworth compared the two ground effects pieces collected from the scene of the hit-and-run with the van. Both of the ground effects pieces in police custody contained screw holes. The police investigators theorized that if the van in their custody was the vehicle that struck Andrew, the holes in the ground effects pieces would align with holes in the van. According to Fickenworth, holes drilled into the rocker panel and front wheel well of the van "pretty well matched up" with holes in the ground effects pieces. Therefore, the police investigators decided to send the van to the Ohio Bureau of Criminal Identification and Investigations ("BCI") for further analysis.
 {¶ 13} At BCI, Karen Kwek, a forensic analyst, examined the van, the ground effects pieces, Andrew's bicycle and Andrew's clothes. Along with glass fragments, Kwek found three tiny, white paint chips on Andrew's clothes. Kwek collected a sample of paint from the van and compared it to one of the paint chips. Kwek concluded that the paint from the van and the clothes was the same in color, layering, and microscopic appearance and similar in chemical composition. On cross-examination, however, Kwek acknowledged that the paint chips found on Andrew's clothes were similar to white paint General Motors used on a number of vehicles, not just the van.
 {¶ 14} Kwek also compared the ground effects pieces with the van and determined that the holes in the pieces aligned with holes present in the van. Based upon the paint analysis and the matching holes, Kwek concluded to a reasonable degree of scientific probability that the paint chips found on Andrew's clothing could have come from the van.
 {¶ 15} Not satisfied with Kwek's analysis, the Starinchaks hired SEA, Inc. to examine the evidence. John Wiechel, a mechanical and biomechanical engineer, was the lead examiner. Wiechel first testified about how he believed the collision occurred. Based upon the damage to Andrew's bicycle, Wiechel determined that Andrew was struck from behind by a van as both he and the van were moving forward in a straight line. Wiechel testified that Andrew's bicycle initially made contact with the passenger side of the van, throwing Andrew against the van so that the left side of Andrew's forehead hit the hood, windshield, or roof. Rather than fall under the van, the bicycle fell to the side of the van. The right handle of the bicycle caught on the backside of the passenger-side ground effects piece, tore through it and yanked off two pieces.
 {¶ 16} Wiechel also testified about his examination of the van. Wiechel determined that the hole in one of the ground effects pieces collected at the scene matched a hole in the van's rocker panel and that a hole in the other ground effects piece matched a hole in the van's front passenger-side wheel well. He found it significant that the edges of the hole drilled in the wheel well were pulled outward, showing that a screw had been forcibly removed from that hole at one time. Additionally, Wiechel found that a flange where two pieces of rocker panel were welded together was bent outward, which was consistent with the type of damage he believed the bicycle handlebar would cause. Further, based upon the types and amount of windshield caulking, Wiechel concluded that three different windshields had been installed in the van, the last before Sapp traded it in on September 9, 1998.[1] Wiechel also found a dent in the van's roof at a location where he concluded that it was likely that Andrew's head hit the van. Finally, Wiechel testified that he discovered abrasions on the molding of the front pillar that supported the roof on the passenger side that were consistent with a pedestrian accident. Given this evidence, Wiechel concluded to a reasonable degree of scientific probability that the Sapp van was the van involved in the hit-and-run.
 {¶ 17} Sapp vigorously disputed that the van he had previously owned was the vehicle that struck Andrew. Sapp testified that he had never hit a bicyclist and that his van never needed bodywork or a new windshield while he had owned it. Sapp's wife, Janelle Sapp, testified that she had never seen the van damaged. Likewise, Sapp's friend, Donald Mills, who saw the van the afternoon of August 3, 1998 — two days after the hit-and-run — never saw any damage to the van.
 {¶ 18} Indeed, no evidence was admitted showing that any repairs had been made to the van in 1998 or that the passenger-side ground effects piece had been replaced in 1998. Rather, Vickie Stout, who had been an employee of Glavel, testified that Glavel did not have any record of anyone ordering a ground effects piece for the Sapp van in 1998.[2]
 {¶ 19} Further, Sapp testified that he was employed by Defense Supply Center, Columbus ("DSCC"). Dana Henry, the deputy director of emergency services for DSCC, testified that all DSCC employees are required to display a DSCC decal on the driver-side bottom corner of their windshield in order to gain access to DSCC grounds. According to Henry, DSCC did not issue a replacement decal to Sapp in August 1998.
 {¶ 20} Sapp reported to work at DSCC from August 3 to August 6, 1998. With the exception of Monday, when he went golfing in the afternoon with Mills, Sapp worked full-time each day. Sapp took vacation time on August 7, 1998, when he left on a planned trip to Las Vegas.
 {¶ 21} Lawrence Gregory DuBois, a metallurgical engineer employed with CTL Engineering, Inc., provided expert testimony supporting Sapp's assertion that he did not hit Andrew. First, DuBois testified that he found five dents in the passenger-side roof of the van, and he did not think any were caused by Andrew because he believed Andrew's head would have hit the windshield, not the roof. Second, DuBois testified that the van had only two different windshields, not three as Wiechel had opined. Third, DuBois testified that the accident would have caused substantial damage to the hood, but that the hood on the van was the original hood and did not show evidence of damage or repair. Fourth, DuBois disagreed with Wiechel that the damage to the flange was cause by the handlebar of Andrew's bicycle because the handlebar showed no corresponding damage. Moreover, DuBois opined that due to the distance between the flange and the gap torn through the ground effects piece, the handlebar could not have damaged both as Wiechel testified. Fifth, DuBois concluded that the abrasions on the molding of the roof pillar were not caused by a pedestrian accident. Finally, DuBois determined that the holes drilled in the ground effects pieces did not match the pre-existing holes in the side of the wheel well and in the bottom of the rocker panel. Significantly, DuBois noted that no hole in the van matched one of the holes in the ground effects piece that would have been attached to the side of the wheel well. Based upon his review of the van and other materials, DuBois concluded to a reasonable degree of scientific probability that the van was not the van involved in the hit-and-run.
 {¶ 22} After hearing all of this evidence, the jury deliberated and returned with a verdict in favor of Sapp. Consequently, the trial court entered judgment in Sapp's favor on April 8, 2004. The Starinchaks now appeal from that judgment.
 {¶ 23} On appeal, the Starinchaks assign the following errors:
1. The trial court erred in permitting counsel for the defendant to ask a series of improper questions of plaintiff's witness, deputy steve fickenworth, specifically designed to bolster the credibility of defense witness David McMannis.
2. The trial court erred in permitting into evidence a page of an alleged log book (Defendant's Exhibit ll) and testimony related to the alleged log book.
3. The trial court erred in directing out all damage claims except for nominal damage in this wrongful death action.
4. The verdict for defendant James O. Sapp was against the manifest weight of the evidence.
 {¶ 24} On cross-appeal, Sapp assigns the following error:
The trial court erred when it denied Defendant/Cross-Appellant James O. Sapp's motion for summary judgment by ruling that the discovery rule, as set forth in Collins V. Sotka (1998), 81 ohio st.3D 506, tolled the two-Year statute of limitations as contained in R.C. 2125.02(D) and therefore the plaintiff's October 8, 2002 Complaint was timely filed.
 {¶ 25} By their first assignment of error, the Starinchaks argue that the trial court erred in overruling their objections to four questions defense counsel asked Fickenworth during his cross-examination. Defense counsel and Fickenworth engaged in the following colloquy amidst the Starinchaks' counsel's objections and the trial court's rulings:
Q: Did you become aware at some point in time that Deputy McMannis had in fact inspected this van within a week of the Starinchak crash?
[Starinchaks' counsel]: Objection. Presupposes.
The Court: If you can answer, you may do so. If you have to explain, you may do that.
The Witness: I had heard that Deputy McMannis had viewed the van prior to or just post to the crash, yes.
* * *
Q: Okay. And were you aware of the fact that Deputy McMannis found no damage whatsoever to the van in question when he viewed the van?
[Starinchaks' counsel]: Objection.
The Court: You may answer if you know.
The Witness: Yes, I had heard he hadn't found any damage to it.
* * *
Q: Are you aware of Deputy McMannis' reputation for thoroughness in the law enforcement community with regard to his investigations?
[Starinchaks' counsel]: Objection.
The Court: You may answer.
The Witness: Yes.
* * *
Q: What is that reputation?
A: He is a —
[Starinchaks' counsel]: Objection.
The Witness: — very thorough investigator.
 {¶ 26} First, the Starinchaks argue that the trial court should have sustained their objections to the first two questions because Fickenworth did not have sufficient personal knowledge to answer. We agree.
 {¶ 27} A trial court has wide discretion in determining whether a witness has sufficient personal knowledge to be competent to testify. Mantle v. Sterry, Franklin App. No. 02AP-286, 2003-Ohio-6058, ¶ 23. Thus, an appellate court will not disturb a trial court's ruling on such competency absent an abuse of discretion. Id.
 {¶ 28} Pursuant to Evid.R. 602:
A witness may not testify in a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. * * *
Consequently, before a witness may testify, the party eliciting the testimony must provide sufficient evidence from which the trial court can infer that the witness has the requisite personal knowledge. 1 Giannelli Snyder, Evidence (1994) 445-447, Sections 602.03, 602.4. "Personal knowledge" is defined as "`[k]nowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said.'" Bonacorsi v. Wheeling Lake Erie Ry. Co.,95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 26, quoting Black's Law Dictionary (7th Ed.Rev. 1999) 875. In other words, "personal knowledge" is "`knowledge of the truth in regard to a particular fact or allegation, which is original, and does not depend on information or hearsay.'" Bush v. Dictaphone Corp., Franklin App. No. 00AP-1117, 2003-Ohio-883, ¶ 72, quoting Brannon v. Rinzler
(1991), 77 Ohio App.3d 749, 756.
 {¶ 29} In the case at bar, Sapp's counsel actually elicited from Fickenworth's testimony indicating that he had no
personal, firsthand knowledge of the subject matter of the questions at issue. Fickenworth testified that beyond comparing the ground effects pieces to the van and overseeing the transport of the van to BCI in July 2001, he had no involvement in the Starinchak investigation. Consequently, Fickenworth could have only learned through hearsay that McMannis inspected the van within a week of the August 1, 1998 accident and that McMannis found no damage at that time. Indeed, Fickenworth's lack of firsthand knowledge is borne out by his answers, each of which is prefaced by, "I had heard * * *." Accordingly, we conclude that the trial court abused its discretion in allowing Fickenworth to answer these two questions.
 {¶ 30} Second, the Starinchaks argue that the trial court should have sustained their objections to the last two questions because Evid.R. 608(A) does not permit testimony regarding a witness's reputation for thoroughness. We agree.
 {¶ 31} Generally, the admission or exclusion of evidence is within the discretion of the trial court, so long as such discretion is exercised in line with the rules of procedure and evidence. Rigby v. Lake Cty. (1991), 58 Ohio St.3d 269, 271. An appellate court will not reverse a trial court's decision to admit or exclude evidence absent an abuse of discretion. Stateex rel. Sartini v. Yost, 96 Ohio St.3d 37, 2002-Ohio-3317, ¶ 21.
 {¶ 32} Evid.R. 404(A) states that, in most circumstances, "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion." However, Evid.R. 404(A)(3) sets forth an exception to this general rule by allowing the admission of evidence of a witness's character on the issue of credibility as provided by Evid.R. 607, 608, and 609. Pursuant to Evid.R. 608(A), a party may introduce rehabilitative evidence of a witness's reputation, but such evidence must refer only to the witness's reputation for truthfulness or untruthfulness. State v. Joyner (Mar. 23, 1999), Franklin App. No. 98AP-785 ("Specifically, character evidence in the form of opinion or reputation may refer only to truthfulness or untruthfulness * * *."); Schaffer v. Donegan
(1990), 66 Ohio App.3d 528, 535-536 (the trial court did not err in refusing to admit testimony that a witness had a reputation as an "honorable and ethical" attorney because such testimony was not indicative of whether the witness was truthful or untruthful).
 {¶ 33} In the case at bar, Sapp's counsel sought to introduce evidence of one element of McMannis' character — thoroughness — through Fickenworth's testimony about McMannis' reputation. However, whether an individual is thorough has no connection to that individual's capacity for truthfulness or untruthfulness. Because admission of evidence of a witness' reputation is limited to evidence bearing upon the witness' truthfulness or untruthfulness, the trial court abused its discretion in allowing Sapp's counsel to introduce evidence of McMannis' reputation for thoroughness.
 {¶ 34} Our conclusion that the trial court abused its discretion in allowing Fickenworth to testify regarding McMannis' investigation of the Sapp van and McMannis' reputation is not the end of our inquiry. Next, we must determine whether the admission of this evidence was harmless error.
 {¶ 35} The erroneous admission of evidence will not justify reversal of an otherwise valid adjudication where the error does not affect substantial rights of the complaining party, or the court's action is not inconsistent with substantial justice.O'Brien v. Angley (1980), 63 Ohio St.2d 159, 164, citing Civ.R. 61 and R.C. 2309.59. If a jury probably would have made the same decision absent the occurrence of the error, then a reviewing court must find that such error is harmless. Id., at 165, quotingHallworth v. Republic Steel Corp. (1950), 153 Ohio St. 349, paragraph three of the syllabus.
 {¶ 36} In the case at bar, we conclude that the admission of Fickenworth's answers to the four questions, asked in the midst of a six-day trial, was harmless. First, the jury did not have to rely upon Fickenworth's testimony to believe that McMannis examined the Sapp van within a week of the hit-and-run and that it was not damaged. McMannis himself testified that he first saw the Sapp van on August 5, 1998 and that, at that time, he did not observe any damage or recent repair. Thus, Fickenworth's testimony of what he had heard second-hand was redundant evidence.
 {¶ 37} Second, whether or not the jury believed McMannis was a thorough investigator had no bearing upon his truthfulness when he testified that he saw no sign of damage or recent repair when he examined the Sapp van August 5, 1998 and took photographs of the van on August 7, 1998. Although in the absence of Fickenworth's testimony the jury may have believed that McMannis was a sloppy investigator, this belief would have no effect on whether or not the operative facts McMannis testified to were true. Further, even if the jury believed that McMannis' sloppiness could have caused him to miss evidence of damage or recent repair to the van on August 5, 1998, the jury could rely upon the objective evidence, i.e., the photographs, to determine for themselves the condition of the van. Lastly, the condition of the van was the subject of extensive expert testimony. Consequently, we conclude that the jury probably would have reached the same verdict even if Fickenworth had not testified as to McMannis' reputation for thoroughness.
 {¶ 38} Accordingly, we overrule the Starinchaks' first assignment of error.
 {¶ 39} By the Starinchaks' second assignment of error, they argue that the trial court erred in admitting into evidence a page of McMannis' log book and his testimony regarding the log book. The Starinchaks assert that Loc.R. 41.04 of the Court of Common Pleas of Franklin County, General Division, required Sapp to include the log book as an exhibit in his final pretrial statement, but he failed to do so. The Starinchaks maintain that the only meaningful sanction for this lapse was to exclude the log book from evidence, and the trial court erred by not imposing this sanction pursuant to Loc.R. 41.06. We disagree.
 {¶ 40} According to Loc.R. 41.04, all parties must file a joint pretrial statement on or before the date of the final pretrial conference, or if a final pretrial conference is not scheduled, at least 14 days before trial. In the joint pretrial statement, each party must list "all exhibits expected to be offered into evidence." Loc.R. 41.04(4). If a party does not comply with this rule, the trial court has the power to impose sanctions. Loc.R. 41.06.
 {¶ 41} As we stated above, the admission or exclusion of evidence is a matter within the trial court's discretion.Rigby, supra. Further, because Loc.R. 41.06 gives the trial court the power to impose sanctions but does not mandate the imposition of sanctions, the trial court also has the discretion to decide whether sanctions are warranted and what type of sanction to apply for a violation of Loc.R. 41.
 {¶ 42} In the case at bar, Sapp's counsel first elicited testimony about the log book during his re-direct questioning of McMannis to buttress McMannis' testimony that he first examined the Sapp van within the first week after the hit-and-run. Sapp's counsel only elicited this testimony because during cross-examination the Starinchaks' counsel twice impeached McMannis with statements McMannis made that he first saw the Sapp van within two weeks, not one week, after the hit-and-run. In explaining to the judge why he should overrule the Starinchaks' counsel's objection to the introduction of the log book, Sapp's counsel stated that he did not expect the Starinchaks' counsel to challenge McMannis' timeline and, thus, he did not list the log book as an exhibit in the joint pretrial statement.
 {¶ 43} Based on these circumstances, we cannot conclude that the trial court abused its discretion in allowing the log book and testimony regarding the log book into evidence. Loc.R. 41.04 requires counsel to only list exhibits that they expect to introduce into evidence, and here, Sapp's counsel did not decide to introduce the log book until after McMannis was attacked on cross-examination. Further, the Starinchaks were not prejudiced by the admission of this evidence because the Starinchaks' counsel knew of and had cross-examined McMannis about the log book during McMannis' deposition.
 {¶ 44} Accordingly, we overrule the Starinchaks' second assignment of error.
 {¶ 45} By the Starinchaks' fourth assignment of error, they argue that the verdict in Sapp's favor was against the manifest weight of the evidence. We disagree.
 {¶ 46} In addressing this argument, we are guided by the principle that judgments supported by competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence.C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus. Further, we must presume the findings of the trier of fact are correct because it is best able to observe the witnesses and use those observations in weighing the credibility of the proffered testimony. Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 81. If the evidence is susceptible to more than one interpretation, we must construe it consistently with the trier of fact's judgment. Cent. Motors Corp. v. Pepper Pike
(1995), 73 Ohio St.3d 581, 584.
 {¶ 47} In the case at bar, the jury had sufficient competent, credible evidence before it to conclude that Sapp was not liable for Andrew's death. Sapp testified that he never struck Andrew with his van. Sapp's wife and friend, who both saw the van within days of the hit-and-run, testified that they never saw damage to the van. McMannis, who first saw the van August 5, 1998, testified that he did not see damage or signs of recent repair to the van. The photographs McMannis took of the van on August 7, 1998 show no damage or apparent signs of repair. DuBois, Sapp's expert witness, testified to a reasonable degree of scientific probability that Sapp's former van was not involved in the hit-and-run.
 {¶ 48} Further, the evidence introduced at trial established that in order for Sapp to drive onto the premises of his workplace, he needed to have a DSCC decal located on his windshield. The photographs McMannis took of Sapp's van on August 7, 1998 show that decal adhered to the bottom, driver-side corner of the windshield. If Sapp had hit Andrew with his van, all the expert witnesses agree that the windshield would have shattered, requiring Sapp to replace both it and the decal. However, Sapp never requested a new decal from DSCC in August 1998. From this evidence, the jury could conclude that the windshield on Sapp's van never shattered in August 1998 and, thus, Sapp did not hit Andrew.[3]
 {¶ 49} To rebut this testimony, the Starinchaks attack the credibility of Sapp, his wife, his friend, and McMannis. The Starinchaks also denigrate DuBois' credentials as inferior when compared to their experts' credentials. However, because the jury is best able to observe the witnesses, we must give deference to the jury's credibility determinations. Seasons Coal Co., supra, at 80. Based upon its verdict, the jury chose to believe the defense witnesses' testimony over the Starinchaks' experts' testimony. Given this, and the evidence discussed above, we conclude that the judgment in Sapp's favor is not against the manifest weight of the evidence.
 {¶ 50} Accordingly, we overrule the Starinchaks' fourth assignment of error. {¶ 51} Because we have found that the only errors the trial court committed were harmless and the judgment in Sapp's favor was not against the manifest weight of the evidence, the Starinchaks' third assignment of error, which challenges the trial court's ruling on damages, is moot. Additionally, Sapp's cross-assignment of error is moot.
 {¶ 52} For the foregoing reasons, we overrule the Starinchaks' first, second and fourth assignments of error. We overrule the Starinchaks' third assignment of error and Sapp's cross-assignment of error as moot. Further, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Bryant and Deshler, JJ., concur.
Deshler, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] The number of windshields installed in the van was relevant because the sole previous owner of the van before Sapp testified that he had the windshield replaced once. Thus, if the van had three windshields before Sapp traded it in, then, logically, Sapp had the windshield replaced once.
[2] However, Stout also testified that some dealerships kept ground effects pieces in stock and, in ordering a ground effects replacement, the buyer did not have to identify the van being repaired.
[3] We note that this conclusion remains valid even if the jury chose to believe that McMannis did not photograph the van until mid-August, as the Starinchaks maintain.