OPINION
{¶ 1} Respondent-appellant, Ruben Auls, appeals from a domestic violence civil protection order ("CPO"), of the Franklin County Court of Common Pleas, Division of Domestic Relations, entered against him pursuant to a petition filed by petitioner-appellee, Deborah Johnson.
 {¶ 2} Appellant and appellee have two children in common. Though never married, the parties did reside together for approximately six years, from 1999 to 2005. On January 14, 2008, appellee filed a petition seeking a domestic violence CPO against appellant. In the petition, appellee alleged appellant came to her house to talk about the *Page 2 
children. After the conversation turned to personal matters, appellee asked appellant to leave, at which time, appellant threw appellee down, ripping her pants in the process. A struggle ensued in which appellee states she tried to get away and get her cell phone to call the police, but appellant took her phone, pushed her, and held her down. Further struggling occurred and appellee eventually grabbed a piece of a frame and hit appellant. At this time appellant left the premises with appellee's cell phone, and appellee went to her neighbor's house to call the police. Appellee also alleged two separate incidents, one in which appellant choked her and one in which appellant smashed her dining room table.
 {¶ 3} After an ex parte hearing, the trial court granted appellee an ex parte CPO effective until January 14, 2008. The ex parte CPO stated a full hearing would occur on January 14, 2008. After several continuances, a full hearing was conducted on March 5 and 6, 2008. At the hearing, the trial court heard testimony from appellee, appellant, appellee's eldest son, Billie Hunter, Jr., and appellee's friend, Deloris Adams. At the conclusion of the hearing, the trial court granted appellee a CPO effective until March 6, 2013. Appellant now appeals from this judgment, and asserts the following two assignments of error:
 I. THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT RESPONDENT COMMITTED AN ACT OF DOMESTIC VIOLENCE AGAINST PETITIONER.
 II. THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THE RESPONDENT CONTROLLING, VERBALLY AND PHYSICSALLLY INTIMIDATING AND A VIOLENT PERSON.
 {¶ 4} Because they are interrelated, we will address appellant's two assignments of error together. As recently stated by this court, "when reviewing whether a trial court properly granted a CPO, an appellate court must determine whether sufficient, credible *Page 3 
evidence supports a finding that the respondent had engaged in acts or threats of domestic violence." Fleckner v. Fleckner, Franklin App. No. 07AP-988, 2008-Ohio-4000, at ¶ 15, quoting Kabeer v. Purakaloth, Franklin App. No. 05AP-1122, 2006-Ohio-3584, at ¶ 7. This court will not reverse the trial court's decision for being contrary to the manifest weight of the evidence so long as there is some competent, credible evidence going to the essential elements of the case. C.E. Morris Co. v.Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus. Further, "[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court." Downs v. Strouse, Franklin App. No. 05AP-312, 2006-Ohio-505, at ¶ 10, quoting Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 81. If the evidence is susceptible to more than one interpretation, the reviewing court must construe the evidence consistently with the trial court's judgment. Id., citingCent. Motors Corp. v. Pepper Pike (1995), 73 Ohio St.3d 581, 584.
 {¶ 5} A person seeking a CPO must prove domestic violence or threat of domestic violence by a preponderance of the evidence. Felton v.Felton (1997), 79 Ohio St.3d 34, paragraph two of the syllabus. For purposes of R.C. Chapter 3113.31," `domestic violence' means the occurrence of one or more of the following acts against a family or household member: (a) Attempting to cause or recklessly causing bodily injury; (b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code; (c) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code; (d) Committing a sexually oriented offense." R.C. 3113.31(A)(1). *Page 4 
 {¶ 6} Appellant essentially contends the trial court erred in finding appellee credible while finding appellant not credible. In support of his contention, appellant directs us to alleged inconsistencies between the petition for the CPO filed by appellee and her testimony at the hearing. According to appellant, though in her petition appellee stated appellant threw her down, at the hearing appellee said appellant just "pushed" her and that she did not know if he hit or slapped her. Also in the petition, appellee stated that appellant pulled her hair, but at the hearing appellee testified that appellant did not.
 {¶ 7} To further attack appellee's credibility, appellant directs us to conflicting notarized statements of appellee pertaining to the care of the parties' children. Lastly, appellant argues the evidence establishes that appellee has no real fear of appellant because they had been intimate after one of the alleged incidents in 2006, and because appellant has spent the night at appellee's residence.
 {¶ 8} Appellant's characterization, however, does not fairly or accurately represent appellee's testimony, as the examples of inconsistencies in appellant's brief consist largely of snippets of incomplete testimony and testimony taken out of context. Appellee described that in 2006, she and appellant were talking when he got angry and threw a brush against the wall. When she told appellant not to do that, "that is when he slapped me," and she "fell backwards against the bed." (Tr. 28.) Thereafter, appellant began choking appellee. Appellant eventually let her go and appellee began screaming, whereupon appellant slapped appellee a few times and told her to "shut up." Id. at 29. Appellee kept "screaming and yelling" and then her son, Billie Hunter, Jr. ("Hunter"), came home. Id. Hunter called the police upon appellee's request, but no arrests were made. *Page 5 
 {¶ 9} In April 2007, appellee described appellant becoming upset and then he "picked up [her] dining room table, and he threw it down and smashed it." (Id. at 22.) On this date, appellee testified appellant also smashed the dining room chair.
 {¶ 10} Later, in 2007, appellee was at 84-year-old Deloris Adams's ("Adams") house when appellant called and wanted to speak to appellee. Though she told appellant no, appellant showed up at Adams's house and refused to leave even after being asked to leave by both appellee and Adams, who, according to her testimony was wielding a machete because she was fearful of appellant. This incident resulted in the police being called, although appellant left before their arrival.
 {¶ 11} The last incident resulting in the filing of the CPO petition at issue occurred in January 2008. According to both parties, appellant went to appellee's house to discuss the children. Appellee testified that appellant then "took over the whole conversation." Id. at 16. The parties then disagreed over how to proceed with the children and some of their toys, resulting in appellant wanting to throw some of the toys away. Appellee then described the incident as follows:
 * * * So he comes back out of the kitchen, and he takes the toys and just throws them down. He walks over to me. By that time I had stood up in front of the couch. He walks over to me, and just calmly — and before I knew it, I was on the floor. I don't think he hit — he slapped me or anything, I think he just pushed me down.
 So then I started to get up, and he had already made it around in front of my head while I was on the floor. And by that time, he grabbed me and picked me up, and, you know, threw me down. I hit the side of the couch and fell onto the floor. I grabbed my cell phone because I told him I was calling the police. That is when he took my hand and, you know, got the phone out of my hand. By that time, he had threw [sic] me down on the couch and my head was turned like this, and his nails scratched me across the neck. *Page 6 
 He was working on the patio doors because they were behind the couch. He was trying to open the door, so I figured he was going out that door. So by that time, I got away from him. I ran to the outside door to get into the hallway. I was screaming all the time and yelling. I banged on my neighbor's door, but she didn't answer the door. By that time he had stopped working on the patio doors and came behind me chasing me, grabbed me and pulled me back in to the house inside the apartment. We got into another struggle then and he threw me down onto the floor. I got up and he grabbed me in a headlock, had my head in a headlock.
 When I got away from him again, I grabbed this piece of wood that was on the frame or something. I started swinging, hitting him with it. By that time, he stepped back and he put up both of his fists and said, now, hit me again. I didn't hit him any more after that. He was standing in between me and the outside — the hallway door. He just stood there staring at me. Finally he moved on and that is when he went out the patio door. He took my phone — my cell phone with him when he left.
Id. at 17-18.
 {¶ 12} As is relevant to the other incidents, Adams testified regarding the time in 2007 when appellant showed up at her house. Hunter testified about the incident in 2006 in which he called the police. Though he never saw appellant hit his mother, he testified he heard his mother say something to the effect of "[y]ou are not going to hit me no more or you are not going to put your hands on me," and when he walked into the bedroom, appellant had appellee "pinned up on his lap." Id. at 91.
 {¶ 13} Appellant first testified about the January 2008 incident. Appellant admitted he ripped appellee's pants, but stated this occurred as follows: "Okay. I was attempting to leave her apartment, and she was attempting to keep me there. And in the process of me moving her out of the way from between me and the door, her pants ripped." Id. at 115. *Page 7 
Appellant admitted pushing appellee to "get some separation" but denied ever hitting or slapping her. Id. at 119.
 {¶ 14} Regarding the 2006 incident where Hunter called the police, appellant admitted to having an altercation, but denied choking appellee. Appellant also testified that Hunter called the police and no arrests were made. As to the dining room table incident, appellant testified he and appellant were talking and he leaned against the table causing one leg to crack. Then, because appellee "went ballistic" over the table, appellant picked it up and threw it down. Id. at 132. Then appellant said, "there the table is out. It's broken. We can get you another table. The table is out of the way. We need to finish our conversation." Id. at 133.
 {¶ 15} Also to suggest appellee's credibility is suspect, appellant takes great issue with the alleged conflicting affidavits of appellee pertaining to the care of the parties' children. The first document written on November 9, 1997 by appellant and notarized on January 2, 1998, states as follows:
Concerned and Relevant Parties,
 By our arrangement, Our daughter, Grace Presence Essence Auls resides with her Father, Ruben L. Auls. Since shortly after birth [which was on Aug. 13, 1997] she has spent at least five nights a week and two thirds of each day in his care. She will be carried as his dependent and no one else's. We are of one mind!
 Parents of Grace,
 RUBEN DEBORAH AULS
 {¶ 16} This statement is signed by appellee and appellant as "Sir Ruben Auls." According to appellee, this was prepared by appellant so that appellant could obtain an apartment rental. Appellant admitted drafting the 1997 statement, asking appellee to sign *Page 8 
it, and referring to appellee as Deborah Auls even though the parties were not married. Appellant contends, however, this statement is in conflict with appellee's affidavit filed in the parties' custody matter in 2005. Though not admitted into evidence, appellee testified the affidavit states, "I have been the primary caretaker of the children since birth until Defendant kicked me out of my home and endeavored to ban me from my children's lives." (Tr. 53.)
 {¶ 17} After review, the trial court found appellee proved by a preponderance of the evidence that appellant committed an act of domestic violence as defined in R.C. 3113.31, by both actually committing acts of violence and by placing appellee in reasonable fear of harm by threat of harm. The trial court found appellee's pants were ripped in such a manner that appellant's version of events was just "not believable to the Court." Id. at 175. The trial court also found not believable appellant's version of how the table was broken. "It's not believable that the legs — all four legs and the cross braces broke by Respondent simply leaning his hands and his upper body weight against the end of the table." Id. at 176. The trial court also noted appellant's lack of explanation regarding the 2006 bedroom incident, and why he was restraining appellee with arms locked around her. The trial court found appellant to be controlling, verbally and physically intimidating, violent, capable of imposing his will and views, and overstepping normal social and interpersonal boundaries. The trial court then devoted three pages of transcript citing examples from the testimony to support those findings.
 {¶ 18} In short, the trial court was presented with two different versions of the relationship between the parties and expressly found appellee's version to be credible. If found to be competent and credible, a plaintiff's testimony alone is sufficient to meet the *Page 9 
preponderance of the evidence standard. Kabeer, at ¶ 13. Here, the trial court had not only appellee's version of events, but also the ripped pants, photographs of the broken table, and the testimony of Adams and Hunter as well. To the extent the limited inconsistencies in the evidence were resolved in favor of appellee, such does not mandate a reversal of the trial court's judgment. Id. at ¶ 12. The rationale for this position is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. Id.
 {¶ 19} After having reviewed the complete record, including the transcript and exhibits, we find the record contains competent, credible evidence to support the trial court's conclusion that a CPO was warranted in this case. Consequently, we find the decision to grant the petition for the CPO was not against the manifest weight of the evidence.
 {¶ 20} For the foregoing reasons, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, is hereby affirmed.
Judgment affirmed.
 BRYANT and KLATT, JJ., concur. *Page 1